2022 IL App (2d) 210557-U
No. 2-21-0557
Order filed July 18, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ADDISON ARMS APARTMENTS, LLC, | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 20-LM-0232 |
| | ) | |
| BRITTANY MC CORP., | ) | |
| LARRY MCDONALD, and | ) | |
| BRITTANY MC CORP. 2152, | ) | Honorable |
| | ) | Bradley J. Waller, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Brennan concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's order granting defendants' motion to enforce settlement is reversed.

¶ 2     Plaintiff, Addison Arms Apartments, LLC, sued defendants, Brittany Mc Corp., Larry McDonald, and Brittany Mc Corp. 2152, for breach of contract and breach of guarantee arising from a commercial lease agreement.  After defendants did not file a responsive pleading, the trial court granted plaintiff's summary-judgment motion.  The parties later engaged in settlement negotiations, and defendants ultimately moved to enforce the settlement.  In sum, the dispute

centered on the scope of the term "release." The court granted the motion to enforce settlement, denied plaintiff's motion to reconsider, and plaintiff appeals. For the following reasons, we reverse.

¶ 3                                    I. BACKGROUND

¶ 4                    A. Lease Agreement, Complaint, Default Summary Judgment

¶ 5     On December 5, 2016, Brittany Mc Corp., as tenant, and Larry McDonald, as guarantor, entered into a commercial lease agreement with a former landlord (who later assigned the agreement to plaintiff) for property located at 131 North Annie Glidden Road in De Kalb. The lease required the tenant to pay incrementally increased annual rent, common area maintenance fees, insurance, and taxes over 20 years, with a possible 5-year extension (*e.g.*, $10,000 monthly for the first 5 years, $11,000 monthly during years 6 through 10, etc.). Upon default, the agreement provided, in part, that the landlord had the right, at its option, to declare the rents for the remaining term, including legal fees and costs of collection, and other indebtedness, immediately due and payable. Further, any rights and remedies given under the lease to the landlord were "cumulative and in addition to and without waiver of or in any derogation of any right or remedy given to it under any law now or thereafter in effect."

¶ 6     On August 12, 2020, plaintiff notified defendants that they had fallen behind in rent and an action in forcible entry and detainer would be commenced within 10 days. On August 28, 2020, plaintiff filed its verified complaint, seeking damages and possession of the premises. Defendants filed an appearance, but no responsive pleading.

¶ 7     In December 2020, plaintiff moved for summary judgment, seeking amounts owed through that date. On February 9, 2021, the court granted plaintiff's summary-judgment motion. The

judgment awarded plaintiff $90,559.36 total ($85,505.01 in damages, $784.35 in court costs, and $4270 in attorney fees).

¶ 8                              B. Citation to Discover Assets and Settlement Negotiations

¶ 9      On March 17, 2021, plaintiff filed a citation to discover assets, and, on March 24, 2021, the answer from the third-party respondent reflected $64,291.86 in a specified checking account. On March 25, 2021, Britany Mc Corp. 2152 filed an appearance and a motion to extinguish the citation lien on the checking funds, essentially arguing that the wrong account had been frozen in response to the citation. Thereafter, the parties' attorneys began exchanging email communications.

¶ 10     Specifically, on March 26, 2021, defendants' attorney, Benjamin Jacobi, emailed plaintiff's attorney, Michael Franz, regarding "compromise negotiations." In part, he discussed the lien that was imposed in response to the citation to discover assets and defendants' desire to have the lien extinguished. However, Jacobi also noted that, while his clients could pursue vacating the summary judgment against them, they also understood the risks going forward and wished to resolve "*this* dispute" without either party incurring additional legal fees. (Emphasis added.) As such, "in exchange for a full satisfaction of the judgment and a release from [plaintiff]," McDonald offered a cash lump sum of $50,000 and an assignment to plaintiff of all rights in the personal property at the premises, unencumbered and valued at $40,000 to $50,000. Jacobi's email concluded, "[w]e believe that this more than adequately compensates your client and satisfies *the judgment* in whole." (Emphasis added.)

¶ 11     On March 30, 2021, Franz responded, in part, "[m]y client rejects the below offer but is willing to settle in consideration for payment of $75,000.00 plus a turnover of the equipment." No release was mentioned.

¶ 12    On March 31, 2021, Jacobi replied that defendants had rejected plaintiff's settlement proposal.  However, they instead offered "(1) $65K in a lump sum cash [payment] within 30 days, and (2) assign/transfer the Personal Property to your client, in exchange for *a full satisfaction of the judgment and a release from your client*." (Emphasis added.)

¶ 13    Later that morning, Franz wrote that he had discussed defendants' offer with plaintiff.  Plaintiff was "willing to go down to $70,000.00 plus the equipment.  I was told that this is a final offer."  Again, no release was mentioned.

¶ 14    Jacobi replied:

"We have a deal at $70K + the equipment *in exchange for a satisfaction of the judgment and a release from your client*.  My client can pay the cash payment within 30 days.  We will want the Citation dismissed.  *We would also like you to draft the settlement agreement*."  (Emphases added.)

¶ 15    Franz responded, "Will do. Thanks."

¶ 16    Jacobi next emailed Franz a list of the equipment to include as an appendix to the settlement agreement.  On April 1, 2021, Franz noted that plaintiff was "very concerned" that defendants would not pay the agreed amount and inquired as to the earliest that they could provide payment.  Defendants agreed to wire payment the next business day, *if* a settlement agreement was in place, but Jacobi noted that they had not yet seen a "draft" of the settlement agreement.

¶ 17    Accordingly, on April 2, 2021, Franz emailed Jacobi a "settlement agreement and mutual release."

¶ 18    A few hours later, Jacobi emailed back a revised agreement, noting that "a couple of edits are redlined. *If this is agreeable*, I will recommend that my client execute the settlement agreement today." (Emphasis added.)

¶ 19    Jacobi's redline edits expanded the scope of the release from one releasing claims concerning the dispute, judgment, and citation to one also releasing claims concerning the lease agreement, First Amendment, and guaranty.  Shortly after receiving Jacobi's edits to the draft agreement, Franz emailed:

> "The only issue I see is including a release of the guarantor under the written agreements. My client is only agreeing to resolve the current litigation, judgment[,] and Citation.  Any future claims after the judgment will not be released.  Otherwise, everything should be fine. I am confirming that payment on Monday, by wire, is good for my client."

¶ 20                    C. Motion to Enforce Settlement Agreement

¶ 21    Three days later, on April 5, 2021, defendants moved to enforce the settlement agreement. They recounted the settlement negotiations as reflected in the email exchange, noting that, when Franz emailed defendants a "draft" settlement agreement, the "proposed" agreement did not include plaintiff's release of defendant from the lease.  Rather, it provided a release only from the current judgment (*i.e.*, the default summary judgment).  "Defense counsel redlined the Settlement Agreement to include also a release from the lease *per the email agreement*," yet Franz responded that plaintiff was releasing defendants only from the current litigation, judgment, and citation, not from future claims.  (Emphasis added.)  According to defendants, the only reasonable way to interpret the term "full satisfaction of the judgment and release from your client" is a satisfaction of the current judgment and a release of all *other* claims, including all claims arising from the lease.  Defendants argued that plaintiff's subjective intent concerning the type of release was irrelevant, noting that their own "objective intent" was repeated three times in the email correspondence, when they offered terms in exchange for a satisfaction of the judgment and a "release from [plaintiff]."  They argued that, if defendants had intended to settle only the current

lawsuit, they would have needed only a satisfaction of the judgment and not an additional release. As the only relationship that existed between the parties was the lease, defendants argued, the only possible release they could request was from the lease agreement. "Defendants agreed to pay money plus property valued at approximately $20,000 to $30,000 *more than the judgment amount*, and Plaintiff agreed to release Defendants from the lease. Otherwise, Defendants would not have agreed to pay a settlement value in excess of the judgment." (Emphasis in original.) Defendants requested that the court enforce the settlement, including a term in which plaintiff "generally releases Defendants from the lease and all amendments thereto," as set forth in the redlined settlement agreement. Defendants attached to their motion the email exchange between the attorneys, as well as the redlined draft settlement agreement.

¶ 22 In response, plaintiff asserted that, while the parties reached a settlement agreement, it disagreed with the terms now proposed by defendants. As background, it noted that, in its complaint and the court's summary-judgment order, it never requested and the court never granted damages for the 16 years or any amounts owed by defendants *after* December 31, 2020, through the termination of the lease agreement on December 31, 2036. Rather, plaintiff sought seizure of $90,559.36: the amounts owed through December 2020, plus attorney fees and costs. Thus, while $70,000, plus the equipment in exchange for a "satisfaction of the judgment and release from your client" were the "literal agreed to terms of the parties' settlement agreement," plaintiff's drafted proposed agreement had included a release only from the current litigation. "Indeed, had plaintiff agreed to settle defendants' post-judgment 16 years of obligations under the lease agreement, plaintiff would not have accepted more than $20,000.00 *less* than the judgment amount." (Emphasis added.) Plaintiff noted that settlement agreements are binding only if there is an offer, acceptance, and meeting of the minds as to the terms of the agreement, and, here, the email

correspondence gave no indication that plaintiff agreed to settle and release defendants from 16 years of postjudgment obligations; rather, the correspondence reflected that plaintiff agreed to settle and release only the claim related to the court's February 9, 2021, judgment. Indeed, plaintiff argued, Jacobi's initial email reflected this was also defendants' intention, as it reflected that defendants believed that their proposed settlement terms more than adequately compensated plaintiff "and satisfie[d] the judgment in whole." As there was no meeting of the minds to release defendants from anything more than the February 9, 2021, judgment, plaintiff requested that the court deny defendants' motion.

¶ 23   In reply, defendants asserted that, in its response, plaintiff had conceded that the parties reached a settlement agreement and that the "literal" terms included satisfaction of judgment and a release. As such, they argued, the dispute concerned the interpretation of those terms, which the court must view objectively, giving meaning to all terms. Defendants argued that, in order to give meaning to all terms, "release" must be interpreted as providing something other than "satisfaction of the judgment." Further, that defendants sought a "release from your client" reflected that they sought a general release, as a release "from your client" is a release from the relationship, which was one that existed only under the commercial lease. Defendants again noted that the cash payment, plus the value of the equipment, exceeded the judgment amount, supporting their contention that they were buying a release in addition to the satisfaction of judgment. Finally, as to the sentence in defendants' initial email, they argued (1) it was not a term of the offer, as the terms of the offer were separately set forth before the concluding sentence; (2) it supported defendants' interpretation, as it had two parts (a) compensating plaintiff and (b) satisfying the judgment; and (3) even if construed as a proposed term of the settlement, it was rejected by

plaintiff, with defendants later making two additional offers, increasing the proposed cash payment term and including their terms for satisfaction of the judgment and a release.

¶ 24    On May 14, 2021, after hearing argument, the court agreed with defendants and granted the motion to enforce the settlement terms with a general release.  The court referred to the definition of "release" as the relinquishment of a right, claim, or privilege.  It then stated that a release is a contract in which "one party agrees to give up all claims of any type against another. A release can be a partial release, but the term must specify that."  Here, the court found, defendants' counsel consistently used the terms "full satisfaction of the judgment and a release," in the correspondence, and plaintiff admitted that the parties entered into a settlement agreement, but disputed the interpretation of the word "release."

¶ 25    The court further noted that plaintiff's lawsuit sought damages for rent, taxes, and insurance from August 1, 2020, through December 7, 2020, but not through the year 2036, although the lease provided that it could do so.  "Plaintiff elected its remedies. The judgment was entered based on a breach of the contract/lease and the guarantee. Those contractual obligations merged into the judgment. Plaintiff is not entitled to now file another cause of action for breach of contract and guarantee for the period 2020 to 2036."

¶ 26    However, the court noted, even if plaintiff *could* pursue such an action, the "second analysis" concerns the term "release."  The court noted that it must give effect to each term set forth in "what I have found to be a legally-enforceable contract" and to "give effect to the intent of the parties in effectuating each term of the contract."  The court found that the only legal relationship that existed between the parties was based upon the lease and personal guarantee, and plaintiff's counsel never used the phrase "partial release," nor did he ever dispute or clarify that

the release encompassed only the judgment up to December of 2020 "at any time prior to or at the time the settlement was entered into on March 31st of 2021." The court continued,

"What motivation would defendants have to turn over the personal property and the $70,000 if they didn't get the—if they didn't get to walk away free and clear of any and all obligations owed to plaintiff in the future?

Presumably plaintiff didn't have a security interest in the equipment, so defendants were giving cash and unencumbered property in return for *** plaintiff's releasing each of the respective defendants from any and all further and future obligations.

Release here means that plaintiff relinquish[ed] any and all rights, claims, causes of action arising out of the lease and the guarantee, past, present, and future. In other words, a general or a full and complete release."

¶ 27    The court ordered defendants to pay plaintiff $70,000 and prepare and execute a bill of sale transferring equipment and personal property to plaintiff, free and clear of any liens or encumbrances. It also ordered plaintiff to tender a satisfaction of judgment to the court, an order dismissing the case with prejudice, and a release of any all rights, claims, and causes of action arising out of the lease and guarantee, both past, present, and future.

¶ 28                          D. Motion to Reconsider

¶ 29    Plaintiff moved to reconsider. It reiterated that settlement agreements are not binding if there is no meeting of the minds or unequivocal acceptance of terms. Further, it argued that it never authorized its attorney to settle all claims under the lease agreement, but only the judgment entered against defendants on February 9, 2021. Plaintiff attached an affidavit from Marc Fein, plaintiff's property supervisor, who attested that he authorized Franz to accept defendants' settlement offer of $70,000, plus assigning ownership of equipment on the premises to plaintiff,

but explicitly instructed that plaintiff was not releasing McDonald from his personal guarantee for *future* claims, and that plaintiff intended to resolve only the February 9, 2021, judgment. Fein attested that he never authorized Franz to settle all potential claims owed by defendants under the lease agreement.

¶ 30    Defendants responded that the issue of plaintiff's counsel's authority was waived (as it was raised for the first time in a motion to reconsider), plaintiff's counsel had express and apparent authority to enter into the settlement agreement, and plaintiff's requested relief was mooted by the doctrine of merger.

¶ 31    On August 26, 2021, at oral argument on the motion, another attorney, Timothy Hoffman, appeared on plaintiff's behalf. Hoffman challenged the court's findings concerning plaintiff's election of remedies and the doctrine of merger, noting that payment of future rent is not a present obligation and recovery for breach of lease is limited to the amount due at the time of trial. Further, Hoffman argued that, as evidenced by Fein's affidavit, Franz did not have authority from plaintiff to release defendants from future claims. In addition, after the court commented that plaintiff did not, when it rejected defendants' initial offers, *contest* the terms requiring full satisfaction of the judgment and release from plaintiff, Hoffman noted that Franz never promised that a release would include *future* rent. "This was an assumption made by the defendant[s]."

¶ 32    The court denied the motion. In sum, the court backed away from any perceived reliance in its ruling on the election of remedies or merger. It noted that it had *not* primarily relied on the doctrine of merger and perhaps should not have mentioned it because the predicate of its decision concerned whether the agreement contemplated a general release. As the parties agreed on the "literal" terms of the agreement, the issue was "not an ambiguity, so to speak, but rather, an interpretation of the agreement as it pertained to the issue of release." The court did not find

appropriate consideration of parol evidence concerning plaintiff's intent to release. It reiterated that there was no ambiguity, and that release and satisfaction of judgment are legal terms with specific, well-defined meanings and that the terms intended to release and satisfy any and all obligations between the parties.

¶ 33   The court also noted that Franz's authority was being challenged for the first time on the motion to reconsider. Further, the court found that Franz had authority to settle. Plaintiff appeals.

¶ 34                                    II. ANALYSIS

¶ 35   Plaintiff argues that the trial court erred in granting defendants' motion to enforce settlement and finding that the release term meant that plaintiff relinquished all rights, claims, and causes of action arising out of the lease. It notes that the court focused on the fact that *plaintiff's counsel* never used the words "partial" release, and it questioned whether defendants would have been motivated to settle without a general release, yet it failed to ask the same questions on plaintiff's behalf. After it had already received a judgment on its claim for rent through December 2020, "[w]hat motivation would Plaintiff have to settle a $2,354,600.00 debt for $70,000.00 plus equipment and forgo its absolute right to sue again for the future obligations under the lease agreement?" Plaintiff notes that the court incorrectly ignored that, although on March 31, 2021, the parties had a settlement agreement regarding the past due rents, on April 2, 2021, *Jacobi* first introduced "general release" terms by redlining the draft settlement agreement and *asking* whether plaintiff was agreeable with the changes. Franz did *not* agree to the changed terms, asserting that plaintiff agreed only to resolve the current litigation. Accordingly, plaintiff argues, Jacobi's proposed change to include a "general release" that Franz had *not* included in the proposed settlement agreement changed the entire "deal" because plaintiff went from releasing a $90,559.36 judgment for $70,000 and equipment to releasing a "2.3 million debt for $70,000.00!" Further, "if

Mr. Jacobi was so confident that a settlement agreement was reached, and that Plaintiff intended to release defendants from all claims under the lease agreement, why would he even ask if Plaintiff was 'agreeable' to the proposed changes ***?" Specifically, Jacobi's email stated: "a couple of edits are redlined. *If this is agreeable*, I will recommend that my client execute the settlement agreement today." (Emphasis added.) In addition, plaintiff notes that the facts do not align with defendants' contention that plaintiff somehow ratified the "general release" when it did not dispute the release term in the correspondence. Plaintiff unequivocally challenged the general-lease language when Jacobi first introduced it in redline edits. Finally, plaintiff "completely disagrees" with defendants' position that the payment terms support their claim for release, because they agreed to pay $70,000 and assign rights to restaurant equipment worth $40,000 to $50,000, which exceeded the judgment and reflects they were buying a release. Plaintiff notes that, under the lease, the equipment became plaintiff's property as of the date of the breach, defendants had not provided evidence to corroborate the equipment's estimated value, but, in any event, even if the equipment was worth $40,000, the deal that the trial court "foisted" on plaintiff becomes no less ridiculous: "releasing a $2.3 million debt for $110,000 (as opposed to $70,000), when Plaintiff had already received summary judgment on liability. Who in their right mind would agree to such a deal after they had already secured a judgment in their favor?" For the following reasons, we agree.

¶ 36   In general, Illinois encourages the settlement of claims. *Kim v. Alvey, Inc.*, 322 Ill. App. 3d 657, 669 (2001). Thus, we review a trial court's finding that a settlement agreement exists under the manifest-weight-of-the-evidence standard. See, *e.g.*, *Lampe v. O'Toole*, 292 Ill. App. 3d 144, 146 (1997). However, as settlement agreements are construed under contract-law principles, we interpret *de novo* settlement terms. See, *e.g.*, *Hassebrock v. Deep Rock Energy*

*Corp.*, 2015 IL App (5th) 140105, ¶ 37 ("The interpretation of a settlement agreement or assignment, both of which are governed by contract principles, is a matter of law that we also review *de novo*."). "As with any contract, there must be an offer, an acceptance, and a meeting of the minds on terms." *Lampe*, 292 Ill. App. 3d at 146. Moreover, when a trial court does not hold an evidentiary hearing related to a purported settlement agreement's formation and terms, we review *de novo* the court's order enforcing the settlement agreement. See, *e.g.*, *Lukanty v. Moglinicki*, 2022 IL App (1st) 210794, ¶ 30.

¶ 37   Here, after reviewing the record and hearing argument, the trial court found that the parties came to an agreement and that the term "release" in that agreement was not ambiguous. Rather, the court found, the parties' disagreement concerned "*interpretation* of the agreement as it pertained to the issue of release." (Emphasis added.) In our view, the record reflects that, while the parties agreed to certain material terms (*i.e.*, $70,000, assignment of equipment, satisfaction of the judgment, and a "release"),[1] and while the word "release" may not be inherently ambiguous, the record nevertheless reflects that there was no meeting of the minds concerning the *scope* of the release. Thus, we conclude that, under either the *de novo* or manifest-weight standard, the trial court erred in granting defendants' motion to enforce the settlement.

¶ 38   Specifically, the record reflects that plaintiff had obtained a $90,000 judgment in its favor, including rent due under the lease agreement only through December 2020. Rather than undertaking the risks and legal expenses associated with attempting to vacate that judgment, defendants initiated with plaintiff "compromise negotiations." In their initial email, defendants

---

[1]In other words, as plaintiff's counsel wrote in his response to the motion to enforce the settlement, the "literal terms" of the agreement.

explained that they wished to resolve "this dispute" and framed their offer to compromise as more than adequately compensating plaintiff and "satisfying *the judgment* in whole." (Emphasis added.) With that context in mind, *i.e.*, a judgment in its favor and an offer from defendants to "satisfy the judgment in whole" via compromise, plaintiff engaged in negotiations. On multiple occasions during those negotiations, however, plaintiff rejected defendants' request for a "release." Indeed, plaintiff's own "final offer" made no mention of a release. Nevertheless, on March 31, 2021, in response to plaintiff's final offer, defendants added a "release" term and requested that plaintiff's counsel provide them with a draft agreement. Plaintiff's counsel responded, "will do," reflecting that he would draft a settlement agreement. He later sent defendants a draft agreement, including a mutual release of claims concerning the "dispute" (defined internally by the trial court case name and number), "judgment," and "citation." This version of the agreement was clearly a draft, as on April 2, 2021, defendants' counsel made redline edits to that draft and asked if plaintiff was "agreeable" to the changes. Those changes, for the first time, reflected defendants' *express* indication that the release would include all future claims that could arise under the lease and guarantee. Specifically, defendants' proposed redline changes provided that, in addition to mutually releasing claims concerning the dispute, judgment, and citation, the release would also cover the "Lease Agreement," "First Amendment," and "the guaranty." Plaintiff immediately *rejected* defendants' changes to the scope of the release.

¶ 39    Given these facts, we cannot conclude that there was a meeting of the minds on the scope of the release term. The trial court and defendants focused on plaintiff's counsel's concession that an agreement existed, contending that the agreement was memorialized on March 31, 2021, when plaintiff's counsel responded, "will do." However, even assuming an agreement on terms was reached at that time, the scope of those terms was not yet clearly defined. For example, even the

specifics of the equipment to be assigned was not yet defined, as defendants' counsel later emailed plaintiff's counsel a list of equipment to include as an appendix to a draft settlement agreement. Similarly, the scope of the "release" was not yet defined as of March 31, 2021, with the specifics of that term being fleshed out in the draft agreement. The trial court found relevant that, prior to March 31, 2021, *plaintiff's* counsel never used the phrase *partial* release, nor "at any time prior to or at the time the settlement was entered into on March 31st of 2021," did he dispute or clarify that the release encompassed only the judgment up to December 2020. We disagree with the court's assessment. Plaintiff's counsel never had occasion or reason to use the phrase "partial release" prior March 31, 2021; indeed, before March 31, 2021, plaintiff repeatedly rejected *all* releases defendants requested. Then, at plaintiff's first opportunity to define the scope of the release term, *i.e.*, in the draft settlement agreement that defendants requested plaintiff prepare, plaintiff reflected its understanding that the release would be limited or partial, not general and for all future claims. When expressly asked if it was agreeable to a general release, plaintiff immediately communicated that it was not. Similarly, the court seemed to accept defendants' suggestion that plaintiff ratified a general release when, after March 31, 2021, but before a draft agreement was prepared, plaintiff did not dispute the release term. Simply put, why would it? The parties were not, in that time frame, discussing that term; they were discussing payment timing. There was not yet any reason for plaintiff to know there *was* a dispute on the scope of the release. Given the record, we disagree with the court's assessment that plaintiff's failure, prior to March 31, 2021, to limit the release, or its failure to do so after March 31, 2021, but prior to circulating the draft agreement on April 2, 2021, served as any ratification of a general release term.

¶ 40    We note that, generally speaking, release terms containing very broad language that do not reflect any clear definition or indication of what claims are being released are interpreted in a

manner to *restrict* the release to include *only* those claims clearly intended by the parties to be released, not claims not contemplated by the parties. See, *e.g.*, *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 21 (2003); *International Insurance Co. v. Sargent & Lundy*, 242 Ill. App. 3d 614, 622-24 (1993) ("A general release will be held to apply only to those claims in existence at the time the release is executed and 'claims which originate subsequent to its execution are not discharged *absent a clear expression of intent to that effect.*' " [citation omitted]) (emphasis added)). While, as defendants note, an action *may* nevertheless be released, even if it is not specifically mentioned or in existence when the release is executed because it may be cumbersome or confusing to list all claims (*Sargent & Lundy*, 242 Ill. App. 3d at 624-25), here, it would not have been cumbersome to expressly list all future claims under the lease and defendants' mention of "release" in the March 31, 2021, email did not do so. In any event, the record reflects that it was *not* the intent of both parties to do so. Yet, rather than restricting the scope of the broad, undefined word "release" to only those claims that both parties clearly contemplated, the trial court performed an opposite construction, interpreting the word as reflecting that plaintiff was relinquishing "any and all rights, claims, causes of action arising out of the lease and guarantee, past, present, and future." Again, the record belies that interpretation. If anything, here, the only claims *both* parties clearly intended to mutually release were those up to the date of judgment; while defendants also wanted more claims released, the record reflects that the intent was unilateral, as plaintiff communicated it was not agreeing to a release of future claims.

¶ 41 The trial court also agreed with defendants' argument that the release term must have meant something more than satisfaction of the judgment; otherwise, under plaintiff's interpretation, the terms are redundant and meaningless. Again, we disagree. More specifically, while we agree that a satisfaction of judgment and a release have different meanings, we disagree that, absent an

interpretation that the release was a general release of all future claims, the terms here would be redundant. As defendants note in their brief, a satisfaction of judgment is a complete discharge of obligations *under a judgment* and/or the document filed and entered on the record indicating that *a judgment has been paid.* Black's Law Dictionary (11th ed. 2019).[2] Here, however, plaintiff's proposed release encompassed more than simply payment of the judgment obligations. Plaintiff proposed a *mutual* release of any and all claims under the dispute, judgment, and citation. A mutual release of such claims is separate from and not redundant to a term that the agreement serves to "satisfy", *i.e.*, pay, the $90,000 judgment amount and terminate that litigation.

¶ 42    Defendants also argue that plaintiff's subjective understanding was not a requirement for a meeting of the minds, which instead exists when the parties' conduct *objectively* indicates an agreement to the settlement terms, even if one party did not subjectively intend to be bound. This may be true, but as we have detailed above, plaintiff's objective conduct here never reflected an intent to be bound to a general release. Further, although defendants argue that a "release" must mean a "general release" from the lease, where the only relationship between the parties is the

---

[2] Further,

"Generally, a satisfaction of a judgment is the final act and end *of a proceeding.* Satisfaction implies or manifests an expression of finality as to all questions of liability and damages involved *in the litigation.* Once satisfaction occurs, further alteration or amendment of a final judgment generally is barred. Satisfaction of a judgment, when entered of record by the act of the parties, is *prima facie* evidence that *the creditor has received payment of the amount of the judgment* or its equivalent, and operates as an extinguishment of the judgment debt." (Emphases added.) 47 Am. Jur. 2d Judgments § 1006, at 443 (1995).

lease at issue, we disagree. Under the fact of this case, the lease agreement provided varying obligations from the parties at varying times over the course of 20 years. Without specificity, we cannot presume that the word "release" alone, in the face of written expressions to the contrary, necessarily meant a release of all claims of all kinds now and in the future. We also find unconvincing defendants' argument that, when it requested a "release from your client," it was requesting a release from the relationship with plaintiff under the lease. This is, at best, a strained interpretation. Rather, defendants requested a release from the "client," *i.e.*, plaintiff, because plaintiff was the only party that could give them one.

¶ 43 We also note that, even if it were appropriate for the court to have gone beyond the record to consider "motivations," as the foregoing facts are apparent on the face of the record and in the written email exchanges, the court did not do so for both parties. The court did not question why plaintiff would agree to release all claims under a 20-year lease, for an amount, at most (if the equipment value is $50,000), roughly $30,000 in excess of the judgment it had already received (plus, plaintiff had already obtained, in response to a citation to discover assets, a lien on $64,291.86 in a bank account), but it queried why defendants would want to settle, if not to obtain a general release for all future claims under the lease. Yet that question was already answered in defendants' own email initiating settlement negotiations: to avoid the risks and legal expenses associated with trying to vacate a judgment that had already been entered against them (further, defendants wanted the citation lien extinguished). They sought instead to vacate the $90,000 judgment against them through settlement, in the nature of a reduced cash offering and an assignment of equipment. We could speculate that, perhaps, these terms were to defendants' benefit because they would not need to produce as much cash and the restaurant equipment was no longer useful to them, as they had vacated the premises (indeed, plaintiff contends that the

equipment reverted to plaintiff anyway upon default under the lease). Whatever the situation or defendants' rationale, the point is that the trial court did not need to question defendants' motivations for agreeing to settle for less than a general release of all future claims under the lease.

¶ 44    In sum, the record is devoid of evidence that there was a meeting of the minds on the scope of the "release" term in the agreement. "Although some terms of a contract may be missing or left to be agreed upon, the parties' failure to agree upon an essential term of a contract indicates that the mutual assent required to make a contract is lacking and, thus, there is no enforceable contract." *Rose v. Mavraki*s, 343 Ill. App. 3d 1086, 1091 (2003). The court erred in granting defendants' motion to enforce the settlement, and we reverse the court's order. As such, we need not address plaintiff's alternative arguments concerning its motion to reconsider and its attorney's settlement authority.

¶ 45                                    III. CONCLUSION

¶ 46    For the reasons stated, the judgment of the circuit court of De Kalb County is reversed.

¶ 47    Reversed.