2025 IL App (1st) 241104-U

SECOND DIVISION
July 29, 2025

No. 1-24-1104

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| TRADEX GLOBAL FUND SPC LTD., | ) | |
| TRADEX GLOBAL MASTER FUND, SPC LTD., and | ) | Appeal from |
| TRADEX GLOBAL ADVISORS, LLC, | ) | the Circuit Court |
| | ) | of Cook County |
| Plaintiffs-Appellants, | ) | |
| | ) | 12CH44218 |
| v. | ) | |
| | ) | Honorable |
| SOLARIS OPPORTUNITY FUND L.P. and | ) | Patrick J. Heneghan, |
| PATRICK G. ROONEY, | ) | Associate Judge |
| | ) | Presiding |
| Defendants-Appellees. | ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**O R D E R**

¶ 1    *Held*: Circuit court decision to vacate judgment due to release executed by judgment creditor was affirmed.

¶ 2    Enforcement proceedings between judgment creditor Tradex Global Advisors, LLC ("Tradex") and judgment debtor Patrick G. Rooney ended when the circuit court granted Rooney's motion to vacate the parties' $1.917 million agreed judgment. The ruling was based on the "Unconditional General Release" that Tradex executed in exchange for $125,000 in a Texas bankruptcy action involving a company that Rooney owned a significant part of, Positron

Corporation ("Positron"). Tradex argues that the circuit court misconstrued the release and that section 12-183(h) of the Code of Civil Procedure, 735 ILCS 5/12/183(h) (West 2016), required nothing less than full payment of the judgment, which Tradex has not received. Section 12-183(h) provides, "Upon the filing of a release or satisfaction in full satisfaction of judgment, signed by the party in whose favor the judgment was entered or his or her attorney, the court may vacate the judgment, and dismiss the action." *Id.*

¶ 3     Solaris Opportunity Fund L.P., which is also a judgment debtor pursuant to the Illinois agreed judgment, did not join in Rooney's motion to vacate, was not encompassed in the order on appeal, and is not a party here.

¶ 4     This suit is the second of three actions that Tradex has used to pursue funds it placed in Solaris Offshore Fund in 2007, which was an investment fund that Rooney was managing. According to Tradex's amended complaint, Rooney would not honor Tradex's $2.067 million redemption notice, so in late 2008, Tradex first sued Rooney, Solaris Offshore Fund, Solaris Opportunity Fund, L.P, and Solaris Management, LLC, in Delaware. The investment fund could not honor Tradex's redemption notice because of Rooney's excessive purchase of shares in Positron when Positron was financially troubled. Positron was a medical technology company incorporated in Texas and officed in Westmont, Illinois. Rooney's purchases not only violated the investment fund's private placement memo, but also, he did not disclose his personal interest in propping up Positron when it had no other sources of funding. Rooney became Positron's chair since 2004, started drawing a salary from Positron in 2005, began accumulating stock options in 2006, and subsequently became its CEO. The Delaware action settled with an agreement that Tradex would dismiss its suit and the Solaris entities would make two payments to Tradex in 2009

that would total $2.067 million. The Solaris entities assured their agreement to the payment schedule by setting aside an equivalent amount of Positron shares and providing an affidavit that would support a $1 million confession of judgment. When Tradex did not receive the first payment, it obtained the $1 million judgment and accepted Positron preferred shares worth $1 million but those shares were restricted from sale until 2012. Thus, Tradex was still entitled to $2.067 million under the Delaware agreement, had a $1 million judgment, and had also become a direct investor in Positron.

¶ 5    Tradex's second suit was this one in Illinois in 2012 against Rooney and the Solaris entities. In its amended complaint, Tradex also sued Positron and Rooney's defunct limited liability company, SBD Investments LLC. Tradex stated that it had received only $150,000, could not sell the Positron shares, and was owed $1.917 million on the Delaware agreement ($2.067 million agreement - $150,000 payment = $1.917 million). Tradex claimed that Rooney was "the only functioning officer and director" of the Solaris entities, used the companies "as a mere façade for his own operations, namely, raising money for Positron," and had "siphoned" every possible dollar to Positron "for his own benefit." Furthermore, in 2012, he used his dissolved LLC to sell an office condominium in Westmont, Illinois to Positron for less than fair market value in order to keep the asset away from Tradex. Tradex also alleged it was "unlikely" that the Solaris entities could honor their debt, because Rooney had used them as "Positron's piggy bank," but, on information and belief, he could personally pay the debt or he could have Positron return Tradex's money to the Solaris entities. Tradex's first amended complaint included claims of breach of the Delaware agreement; conduct that warranted piercing the corporate veil; and fraudulent transfer of real estate that should be relinquished to Tradex.

¶ 6    The parties spent more than two years in motion practice, including cross-motions for partial summary judgment which the circuit court resolved largely in Tradex's favor in October 2014. As for the Solaris entities' obligations under the Delaware settlement, the court indicated there was already a $1 million Delaware judgment, granted a $1.067 million Illinois judgment with interest accruing since 2009, and gave credit for the $150,000 payment that Tradex had received. The ruling was not against Rooney because he was not a party to the Delaware agreement. However, the court also ruled that the corporate veil of the Solaris entities should be pierced so that Rooney could be held liable for the corporations' unfulfilled obligations. With respect to the fraudulent transfer count, the court denied summary judgment. The parties then chose to settle the Illinois action in June 2015. Tradex agreed to withdraw its fraudulent transfer count, no longer seek leave to file a second amended complaint, and, also update the Delaware record to acknowledge it received the $150,000. The withdrawal of the fraudulent transfer count meant that Positron was no longer a defendant in Illinois. In return, Rooney and the Solaris entities would be jointly and severally liable for what Solaris had been liable for in Delaware: repayment of $1.917 million dollars, and interest would continue to accrue. Not much had actually changed in the six years since the parties settled in Delaware in 2009, other than that Tradex had received $150,000, Rooney had become personally liable, and both sides had been burdened by litigating in Illinois.

¶ 7    The Illinois proceedings coincided with Rooney's prosecution for conspiracy to commit securities fraud. According to the judgment order now on appeal, Rooney pled guilty and agreed that he " 'shall not own, operate, act as a consultant, be employed in, or participate in any manner, in any purchase and sale of securities during the period of supervision.' " Rooney also resigned from all of his roles at Positron on September 8, 2014 and he never again served as a Positron

officer or director. Nevertheless, Rooney did and would continue to hold 25-to-30% of Positron's shares. He began serving a six-month prison sentence in June 2015.

¶ 8 The year 2015 was also when some of Positron's creditors forced the Texas company into Chapter 11 involuntary bankruptcy proceedings. 11 U.S.C. § 303 (2010). Positron's bankruptcy would be the third legal action that Tradex would use in pursuit of some of the millions of dollars it had once entrusted to Rooney's management. According to Rooney's appellate brief, "Tradex interjected itself" into the bankruptcy proceeding in 2016 after the creditors had negotiated a settlement that was pending judicial approval. "Tradex's participation in the Positron bankruptcy was premised not on any claim *** Tradex [had] against Positron, but rather on Tradex's 2015 [$1.917 million Illinois] judgment against Solaris and Rooney." The "proof of claim" could not directly implicate Positron, because Tradex had withdrawn its allegations against Positron in Illinois and Positron was not party to the Illinois agreed judgment. None of the Solaris entities were involved in the bankruptcy. Rooney participated as one of Positron's creditors. A bankruptcy court order describes Tradex's $1.917 million proof of claim against Positron as a "[L]itigation claim" involving "certain third-party funds" "that Positron allegedly was not entitled to receive and use *** to purchase the real property *** in Westmont, Illinois."

¶ 9 Positron's creditors negotiated a new reorganization plan in March 2017 that included Tradex and in May 2017 the plan was approved. In order to satisfy Tradex's claim, it was agreed and ordered:

"(1) Positron will market and sell the Westmont Real Estate and use the first $125,000 of the net proceeds of sale to satisfy the claim of Tradex in full; (2) contemporaneous to the transfer of the $125,000, Tradex and Positron will exchange mutual and comprehensive

releases; and (3) Tradex will surrender to Positron any and all shares of Positron stock held by Tradex or any party related to Tradex."

¶ 10    In other words, the transfer of $125,000, relinquishment of every share of Positron that Tradex had received from Rooney, and execution of "mutual and comprehensive releases" would sever all of Tradex and Positron's connections.

¶ 11    The Texas reorganization plan indicates six classes of claims. Tradex was the only Class 1 claimant and its $1.917 million claim was by far the largest of all the claims. Class 6 consisted of four "insiders" at Position holding promissory notes or other general unsecured claims which together totaled about $1.267 million. The agreement specifies that the "insiders who hold notes or other obligations *** consist of Tis Prager, Corey Conn, Patrick Rooney, and an entity owned by Patrick Rooney called Surloc, Inc." Rooney's Class 6 "unsecured insider note" to Positron was for $163,231. The agreement also states, "Reduction of Patrick Rooney note(s): The note(s) of Patrick Rooney will be reduced by $125,000, which is the same amount as the Tradex settlement." The record submitted for our review does not include a copy of the bankruptcy court's approval order entered on May 17, 2017, but its contents are summarized in the order on appeal. According to the circuit court, the bankruptcy court again specified that the Class 6 members "insiders" included "Patrick Rooney" and indicated that the settlement would take effect on June 7, 2017. A bankruptcy court order dated May 23, 2017 contains another reference to Rooney as a Class 6 member, *i.e.*, stating that he was a Positron "insider."

¶ 12    Tradex received the $125,000 and transferred the Positron shares; and Tradex and Positron executed the "mutual and comprehensive releases" that ended their association.

¶ 13    Their contract of one-and-one-half pages is entitled "Unconditional General Release[,]

(*Releasor: Tradex Global Advisors LLC*)." It includes a "Recitals" section consisting of six paragraphs that are lettered A through F, then a "General Release" section which includes release language and six numbered paragraphs.

¶ 14    Paragraph E of the Recitals section defines "Tradex" to include "Tradex Global Advisors LLC and its parents, affiliates, and subsidiaries, and the insiders, officers, directors, employees, attorneys, agents, representatives, heirs, beneficiaries, successors and assigns." Paragraph F defines " 'Claim' or 'Claims' " as follows:

> "As used in this Release, the term 'Claim' or 'Claims' shall include all claims, causes of action, offsets, counterclaims, defenses, and affirmative defenses, as well as any right or claim for the payment of money or any right to any equitable relief or equitable remedy of any type, whether known or unknown, direct or indirect or derivative, fixed or contingent, liquidated or unliquidated, joint or several, matured or unmatured, contingent or non-contingent, and whether grounded in tort of any other common law duty or based upon any contract or agreement or any law, statute, ordinance, or regulations of any governmental unit or entity, and which are based upon, relate to, or arise out of any conduct, event, transaction, or occurrence from the beginning of the world through the effective date of this Release. Without limiting the generality of the foregoing, this shall specifically include all claims, causes of action, offsets, counterclaims, defenses, and affirmative defenses, as well as any right or claim for the payment of money or equitable relief of any type asserted in, or which could have been asserted in any way by Tradex against Positron, or any facts, claims, issues, rights, remedies, and/or defenses related thereto. Further, without limiting the generality of the foregoing, the terms 'Claim' or 'Claims' are intended to be given the

broadest possible interpretation to effectuate the intent of the Parties that this Release shall constitute a general, global, and complete release of Positron by Tradex without any exceptions or reservations."

¶ 15   This paragraph concludes the Recitals section. Next is the subheading "General Release" and the statement: "ACCORDINGLY, for value received, the receipt and sufficiency [of] which is hereby respectively acknowledged by Tradex and in further consideration of the provisions of the Plan, Tradex hereby unconditionally releases all Claims against Positron." The numbered paragraphs of the General Release section then provide in relevant part:

"1. The above release by Tradex is intended to constitute a global, general release of all such Claims held or asserted, and/or potentially held or asserted, by Tradex against Positron and the Positron Related Parties (as defined below), whether individually, jointly, severally, or jointly and severally, and which might be asserted by Tradex as counterclaims, defenses, affirmative defenses, or offsets.

2. This Release by Tradex shall also inure to the benefit of [] each of the insiders, officers, directors, employees, attorneys, agents, representatives, heirs, beneficiaries, successors, and assigns of Positron (collective[ly], the 'Positron Related Parties'), all of which are also express and intended beneficiaries of this Release.

3. Tradex further agrees, promises, and forever covenants not to file, prosecute, or continue prosecuting a lawsuit, arbitration, legal proceeding, or other dispute resolution procedure against Positron or any of the Positron Related Parties concerning any Claim or claims [(sic)] released herein."

¶ 16   The release became significant two years later, when Tradex resurrected this Illinois

lawsuit by initiating supplementary enforcement proceedings and Rooney attached the Unconditional General Release to a motion to vacate the agreed judgment. Michael Beattie, Tradex's president and CFO, alleged that Rooney had property or income that Tradex was entitled to reach, specifically that Rooney continued to "maintain a personal residence *** in Oak Brook, Illinois, despite his assertions that he has no regular or routine income." Rooney contended, however, that Tradex had forever relinquished "all claims" and "any right or claim for the payment of money" from "Positron Related Parties" and that "Positron Related Parties" were defined as "insiders" such as himself. Tradex disputed Rooney's interpretation of the release, contending that Rooney was not an "insider" or intended beneficiary of the release, and that after Tradex and Positron had agreed to expressly exclude him from the release, Tradex had (mistakenly) executed a different version of the document that should not be enforced.

¶ 17    The circuit court held an evidentiary hearing on Rooney's motion to vacate. We cannot fully summarize the proceedings because the record on appeal does not include complete transcripts and all of the exhibits from the four-day hearing. However, the order on appeal indicates that the proceedings covered the parties' history, beginning with Tradex's investment and ending with the drafting and execution of the release some ten years later. We also have a transcript of Beattie's testimony on "Day 2."

¶ 18    The court summarized that most of the testimony and over two dozen exhibits involved the release negotiations and Tradex's argument that the release should not be construed to include Rooney. The evidence established a timeline of events leading up to the signatures. Positron's reorganization plan stated that Positron would pay Tradex $125,000 and that the parties would exchange releases on or before June 7, 2017. Positron paid the $125,000, but the parties did not

finalize their release language on time. "Discussions over the text of the Tradex release took months, endured many time lapses of inactivity, mostly on the part of Tradex, and seemingly was not a priority for either Tradex or Positron." On June 30, 2017, Tradex's attorney, Christopher Murray, e-mailed Positron's attorney, Jeff Carruth: "Plan says that we are to exchange releases and Tradex is to surrender all stock. Do you see a problem in any of that getting done?" Murray testified that he was communicating with his client at Tradex, Beattie. Carruth testified that he was communicating with his client at Positron, Corey Conn, who was Positron's CEO. Rooney acknowledged that he did not speak directly with either of the attorneys about what to include in the release. Positron's attorney, Carruth, wrote and attached the first draft and made a notation in the upper left hand corner of each page that included the initials of his law firm: "WKPZ DRAFT JUNE 30, 2017." The first draft of the release contained what the circuit court characterized as an "extremely broad" definition of the terms "claim" or "claims" that were subject to the release. In addition, Tradex was expressly releasing Position and "Positron Related Parties." The draft further specified, "2. This Release by Tradex shall also inure to the benefit of each of the insiders, officers, directors, employees, attorneys, agents, representatives, heirs, beneficiaries, successors and assigns of Positron (collective[ly, the 'Positron Related Parties'), all of which are also express and intended beneficiaries of this Release." Carruth forwarded the first draft to Murray by e-mail on July 13, 2017, which Murray would later testify was approximately a month after Positron's bankruptcy plan could no longer be appealed.

¶ 19    Murray did not respond to Carruth for nearly six weeks. In an e-mail on August 9, 2017, Murray wrote: "Jeff, Attached is a proposed markup of the release. I am still waiting on my client's approval, but I wanted to send this to you now in the interest of time. Let me know if this is

acceptable or if we need to discuss this further." Murray had "red-lined" Carruth's draft with three significant changes to paragraph 2: (1) Murray struck the words "the insiders, officers, directors, employees, attorneys, agents, representatives, heirs, beneficiaries;" (2) Murray changed the remaining phrase "successors and assigns of Positron" to read "successors and assigns of Positron but only in their capacities as such;" and (3) Murray added a concluding sentence to the paragraph, "For the avoidance of doubt, the Positron Related Parties do not include Patrick Rooney; Solaris Opportunity Fund, L.P., Solaris Offshore Fund, Solaris Management, LLC, or SBD Investments LLC." That same day, Carruth acknowledged receiving Murray's e-mail. Five days after that, Murray asked if Carruth had reviewed the second draft. The next communication, however, was not until nearly six weeks later, on September 19, 2017, when Carruth asked, "Do you think we could keep the deleted language re officers + directors but also keep your insert/limitation re Rooney et al?" According to the circuit court, there was no indication in the e-mails that the attorney "had actual authority to suggest these proposed changes or, instead, merely was tossing out ideas for possible consideration by Tradex." Over the next week or so, the attorneys exchanged additional e-mails, but not additional drafts, then nearly two months passed with no further activity on the release.

¶ 20   On November 22, 2017, Carruth e-mailed Murray, stating that Carruth had secured Positron's signature and was ready to send it along to Murray, and asking whether Murray had secured Tradex's signature. Carruth apparently did not receive a response from Murray for over a week, so on December 1, 2017, Carruth e-mailed to again inquire whether Tradex had signed. Murray answered the same day, saying that he re-sent the release to his client for signature. On December 11, 2017, Carruth sent a similar e-mail query, and Murray responded: "Jeff, signed

release attached" and Murry attached the "Unconditional General Release" that Beattie had executed for Tradex. According to the circuit court, the contents of the signed release appeared to be the original draft dated June 30, 2017, but it no longer included Carruth's notation in the upper left-hand corner indicating that it was a draft.

¶ 21 After describing the negotiations, the circuit court determined that the executed release had five provisions that were significant. The first four were that the release (1) was executed pursuant to the reorganization plan; (2) had the same effective date as the reorganization plan; (3) expressly referred to and incorporated the reorganization plan; and (4) specified that the terms used in the plan "are given the same meaning in this Release." The fifth distinction was in numbered paragraphs 1, 2, and 3:

" '1.    *The above release by Tradex is intended to constitute a global, general release of all such Claims held or asserted, and/or potentially held or asserted, by Tradex against Positron and the Positron Related Parties* (as defined below), whether individually, jointly, severally, or jointly and severally, and which might be asserted by Tradex as counterclaims, defenses, affirmative defenses, or offsets.' [Tradex Unconditional General Release ¶ 1 (emphasis added).]

2.    *This Release by Tradex shall also inure to the benefit of the [sic] each of the insiders, officers, directors, employees*, attorneys, agents, representatives, heirs, bene-ficiaries, successors and assigns of Positron (collectively, the 'Positron Related Parties'), all of which are also express and intended beneficiaries of this release. [*Id*. ¶ 2 (emphasis added).]

3.  *Tradex further agrees, promises, and forever covenants not to file, prosecute, or continue prosecuting a lawsuit, arbitration, legal proceeding*, or other dispute resolution procedure *against Positron or any of the Positron Related Parties* concerning any Claim or claims released herein, whether known or unknown, contingent or non-contingent, *which they may now have or may make in the future against Positron or any of the Positron Related Parties* concerning or related to any Claim or claims released herein.' [*Id.* ¶ 2 (emphasis added).]"

¶ 22    The circuit court also remarked that Tradex had not produced a different signed version or elicited testimony indicating that there was a Beattie-signed version other than the one that Rooney's motion to vacate relied upon.

¶ 23    The circuit court summarized Rooney's testimony that at Positron's request and only because Rooney was going to be released, Rooney reduced Positron's debt to him by $125,000 so that Positron could fund its $125,000 settlement payment to Tradex. The circuit court pointed out that the reorganization plan's various $125,000 transactions had to be related rather than coincidental, given that all of them involved the same amount of money, and that the reorganization plan expressly paired Rooney's $125,000 concession to Positron with the amount that Position was paying to Tradex. Rooney also testified that he and he alone gave the only consideration or concession that supported the resolution of Tradex's claim in the Positron bankruptcy. He stated that he would have contested the validity of Tradex's proof of claim and voted against the renegotiated plan of reorganization, if he was not going to be covered by Tradex's release. When Rooney tried to obtain a copy of the release in the fall of 2017, the attorneys would not return his calls and it was not until after the bankruptcy proceedings that he received a copy

with Beattie's signature. It contained the language that Rooney was expecting which included him as a "Positron Related Party." Rooney further testified that the first time he heard Tradex contend that the claims against him had not been released was in these proceedings in 2019, when he filed his motion to vacate. Carruth (Positron's attorney) also testified that the issue came to his attention in 2019, well over two years after the reorganization plan took effect and two years after Carruth was involved in drafting the release. Neither Carruth, nor Murray, nor Beattie testified that any of them communicated to Rooney at any time that he was excluded from the release.

¶ 24    When Beattie testified, he acknowledged that Positron's reorganization plan indicated that its $125,000 settlement payment to Tradex "was coming from a debt that Positron owed to Mr. Rooney." Beattie testified that he would, however, "[a]bsolutely never" release Rooney or Solaris from the "huge judgments." Beattie rejected the first draft and repeatedly told Tradex's attorney, Murray, "to make sure that our claim [is] protected in Chicago and Delaware." Beattie subsequently saw a revised version of the release which said in part, "For the avoidance of doubt, the 'Positron Related Parties' do not include Patrick Rooney, Solaris Opportunity Fund, L.P., Solaris Offshore Fund, Solaris Management, LLC, or SBD Investments LLC." This revised version was what Beattie intended to sign, but he was e-mailed "the wrong document" for signature and "didn't go back and check" the actual language that he was signing.

¶ 25    The circuit court summarized that "admissions from Beattie and others reveal beyond any doubt that Tradex's goal here is to secure relief from the consequences of its own unilateral mistake(s)" while executing the release. However, unless a mutual mistake or fraud has occurred, and because settlements are encouraged and favored, an unambiguous release will be given effect. Positron failed to prove that the executed release should be invalidated, so "the question before

[the] Court, [was] *** whether Rooney was released [by that document]." The court reasoned that the language of the release, Rooney's status as an "insider" and the fact that he gave consideration for the release (the $125,000) were sufficient to establish a *prima facie* case to vacate the judgment, and that Tradex had no persuasive argument to the contrary. The court determined that the agreement did release the Illinois money judgment, and the court denied Tradex's motion to reconsider.

¶ 26    On appeal, Tradex has abandoned its argument that the release should be invalidated because of its unilateral mistake in executing the "wrong" draft. Tradex's main argument is that the release lacks the specificity that would be necessary to release the Illinois agreed judgment because it releases "claims," but "claims" are not "judgments," and because Tradex released "Positron," but "Positron" is not "Solaris [Opportunity Fund]" or "Rooney." Tradex argues that a contract should be construed as written without considering parol evidence about the parties' intentions, and should be construed against Solaris and Rooney because they sought to benefit from it. Tradex contends these are questions of contract interpretation that are subject to *de novo* review. Tradex also proposes the *de novo* standard because its second argument poses a question of statutory interpretation. Tradex has received only a fraction of the $1.917 million Illinois judgment debt and argues that the governing statute, section 12-183(h) of the Code, required Solaris Opportunity Fund and Rooney to pay the "full" judgment amount plus interest in order to be relieved of the judgment.

¶ 27    We are disregarding Tradex's arguments about Solaris Opportunity Fund because that entity did not move to vacate the judgment and is not affected by the order on appeal. Rooney was the only movant and is only the appellee.

¶ 28   Rooney responds that the strength of the testimony and the unambiguous contract support the ruling on appeal. He does not respond to Tradex's contention that the testimony and exhibits have become irrelevant because the court is construing a contract. He does not propose a standard of review. He also fails to acknowledge that Tradex is making an argument about the meaning of the statute.

¶ 29   "A release, in essence, is the abandoning of a claim to the person against whom the claim exists and where the release is executed with knowledge of its meaning, causes of action covered by the release are barred." *Ogren v. Graves*, 39 Ill. App. 3d 620, 622 (1976); *International Insurance Co. v. Sargent & Lundy*, 242 Ill. App. 3d 614, 622 (1993) (a release is "a contract whereby a party abandons a claim to the person against whom the claim exists"); *Loberg v. Hallwood Realty Partners, L.P.*, 323 Ill. App. 3d 936, 941 (2001) (same).

¶ 30   The standard of review in a section 12-183(h) proceeding is not well-established. Tradex argues for the *de novo* standard of review, but this appeal is not limited to questions of law. There was a four-day evidentiary hearing in which both sides presented testimony advancing their views on the meaning of the release language.

¶ 31   Some appellate panels have used the abuse of discretion standard when reviewing whether a release of judgment was proven in the circuit court. See *Meyer v. First American Title Insurance Agency of Mohave, Inc.*, 285 Ill. App. 3d 330, 336 (1996) (in a case of first impression, determining that the abuse of discretion was appropriate because a section 12-183(h) motion that argues an obligor has been released from judgment (735 ILCS 5/12-183(h) (West 1994)) is comparable to a section 2-1401 petition that seeks relief from judgment (735 ILCS 5/2-1401 (West 1994))); *Klier v. Siegal*, 200 Ill. App. 3d 121, 125 (1990) (indicating that the former practice of a judgment debtor

seeking an order of satisfaction of judgment was to proceed under what is now known as section 2-1401 of the Code, 735 ILCS 5/2-1401 (West 2016)); *Doctor's Associates, Inc. v. Duree*, 319 Ill. App. 3d 1032, 1044 (2001) ("*Duree*") (citing *Meyer*, 285 Ill. App. 3d at 336).

¶ 32    It does not appear that evidentiary hearings were required in the above cases in order to resolve material conflicts in evidence about the formation and terms of a purported release. An evidentiary hearing was appropriate in this case because the release was expressly given to "Positron," "Positron Related Parties," and Positron's "insiders," but not expressly given to "Rooney" and the $1.917 million Illinois agreed judgment. The release was ambiguous as to him and the Illinois judgment debt. See *Bankier v. First Federal Savings & Loan Ass'n of Champaign*, 225 Ill. App. 3d 864, 869 (1992) ("A document is ambiguous if its terms are capable of being understood in more than one sense because either an indefiniteness of expression or double meaning is attached to them."); *Ford v. Dovenmuehle Mortgage, Inc.*, 273 Ill. App. 3d 240, 244 (1995) (language that can be read with more than one reasonable meaning is ambiguous, it is not ambiguous merely because the parties disagree about its meaning); *Thompson v. Gordon*, 241 Ill. 2d 428, 443 (2011) (words that are reasonably susceptible to more than one meaning are ambiguous). A hearing was also necessary due to the judgment creditor's contention that the executed release was not binding because it was the "wrong" draft. *Lukanty v. Moglinicki*, 2022 IL App (1st) 210794, ¶ 28 (when additional evidence or testimony is required to resolve a disputed issue regarding the formation and terms of a settlement agreement, an evidentiary hearing may be appropriate).

¶ 33    The circuit court needed to hear testimony, evaluate its credibility, and resolve the material conflicts in order to reach a sound decision about Rooney and the Illinois debt. *Id*. at ¶¶ 27-28

(contrasting when validity of settlement agreement is resolved on documentary evidence alone or on basis of an evidentiary hearing); *In re Parentage of W.J.B.*, 2016 IL App (2d) 140361, ¶ 20.

¶ 34   When the circuit court has held an evidentiary hearing, we review its findings of fact under the manifest weight of the evidence standard and rulings as to questions of law under the *de novo* standard. *Lukanty*, 2022 IL App (1st) 210794, ¶¶ 27-28; *Addison Arms Apartments, LLC v. Brittany Mc Corp*, 2022 IL App (2nd) 210557-U, ¶ 36 (whether a settlement agreement exists is reviewed for manifest weight of evidence, but terms of the contract are subject to *de novo* scrutiny); *Condon & Cook, L.L.C. v. Mavrakis*, 2016 IL App (1st) 151923, ¶ 58 ("since the trial court held an evidentiary hearing [to resolve whether there was an oral settlement agreement], there is no question that a manifest weight standard applies"); *Dep't of Healthcare and Family Services ex rel. Sanders v. Edwards*, 2022 IL App (1st) 210409, ¶ 44 (dispute over personal jurisdiction raised within a section 2-1401 petition is normally reviewed *de novo*, but if there is an evidentiary hearing, then the manifest weight standard applies to the factual findings); *In re Parentage of W.J.B.*, 2016 IL App (2d) 140361, ¶¶ 20-23 (an evidentiary hearing regarding personal jurisdiction is subject to manifest weight not clear error); *Madison Miracle Productions, LLC v. MGM Distribution Co.*, 2012 IL App (1st) 112334, ¶ 39 (same).

¶ 35   A finding about the validity of a release is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or where a decision is palpably erroneous and wholly unwarranted. *Lukanty*, 2022 IL App (1st) 210794, ¶ 27.

¶ 36   A court will construe an agreement as a whole, viewing each part in light of the other parts, and reading the words and clauses in context, rather than in isolation, in order to give effect to the parties' intention. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). "The intention of the parties

*** controls the scope and effect of the release, and this intent is discerned from the release's express language as well as the circumstances surrounding the agreement." *Duree*, 319 Ill. App. 3d at 1045. A release will not be construed to include claims that the parties did not contemplate. *Id*.

¶ 37    Here, although the 2017 release does not refer to Rooney or the 2015 Illinois action by name, the agreement's very clear and broad language encompasses him and the judgment debt at issue. This is particularly true when the circumstances suggest that Tradex considered Rooney's debt to be uncollectible. When Tradex negotiated the release in 2017, it had been trying to enforce its $2.067 million redemption notice from the Solaris investment fund for roughly nine years, and, despite its persistent effort and legal expense in three different states, Tradex had recaptured only $150,000.

¶ 38    Tradex first pursued Rooney and the Solaris entities in Delaware when its redemption notice from Solaris Offshore Fund in 2007 was disregarded. The parties quickly settled for $2.067 million, but the Solaris entities failed to pay anything in 2009, and in the ensuing four years, turned over only $150,000, which barely reduced the debt to $1.917 million. The lack of timely payment entitled Tradex to take 42 million Positron shares which had been set aside to secure the Delaware agreement, but the shares were apparently worthless. In its Illinois lawsuit in 2013, Tradex alleged that the shares were restricted from sale until early 2012, and despite Tradex's use of "all reasonable efforts" in 2012 and 2013, it could not sell *any* of the shares. It sued for the $1.917 million that it had been unable to collect through Delaware. It sued Rooney, the Solaris entities, SBD Investments, and Positron, but its allegations indicated that the real defendant was Rooney. Tradex described the Solaris entities as "inadequately capitalized" and perhaps even "insolvent"

due to "their inordinate investments in Positron." It described SBD Investments as a defunct "fictional corporation" that had been dissolved in 2011 but used as the conduit to transfer the Westmont office condominium to Positron. It described Positron as a "failing company," even though Rooney had given it all of Tradex's money and the Westmont office property. Tradex asked the Illinois court to pierce the corporate veil in order to overcome Rooney's "fraud and injustice" regarding the $1.917 million.

¶ 39    Tradex litigated in Illinois for two years before relinquishing its claim against Positron and settling with Rooney and the Solaris entities in 2015. However, the Illinois settlement would prove to be even less productive than the Delaware settlement. Rooney went to prison in 2015 for conspiring to commit securities fraud, and, despite all the additional money and time that Tradex had expended in Illinois, it could not collect another penny from him. Positron's circumstances also worsened to the point that its creditors forced it into bankruptcy court.

¶ 40    Tradex does not dispute Rooney's contention that its entree into the bankruptcy proceeding was the Illinois agreement that had nothing to do with Positron. According to the circuit court order on appeal, "Much of the testimony [heard in the circuit court] involved a detailed discussion of the Positron bankruptcy proceeding, including whether Tradex even possessed a *valid* claim to assert in that proceeding." (Emphasis added.) Regardless of why Tradex was allowed to participate in the bankruptcy, it was allowed to be there and to vote on a reorganization plan. Despite borrowing money from its "insiders," Positron could not pay its employees and vendors. Insider Corey Conn had loaned Positron $310,000, insider Tis Prager was owed $593,618, and insiders Rooney and his company Surloc, Inc. were owed a total of $238,000. Position's first amended plan of reorganization dated March 27, 2017, describes Tradex's claim as "a general unsecured claim"

and specifies that all unsecured creditors would receive "approximately five (5) cents on the dollar." By our calculations, 5% of $1.917 million would have been only $95,850. Understandably, Tradex was willing to give back all of the unmarketable Positron shares and execute a comprehensive release, in order to get the greater sum of $125,000. The amount was not only a sizeable recovery in the bankruptcy matter, but it was also far more than Tradex had collected in Illinois. Beattie acknowledged that the cash "was coming from a debt that Positron owed to Mr. Rooney."

¶ 41    After Tradex had pursued Rooney and his various companies for years, it wrote off his debt. In the Recitals section of the Unconditional General Release, paragraph E, "Tradex" is comprehensively defined to include "Tradex Global Advisors LLC and its parents, affiliates, and subsidiaries, and [any] insiders, officers, directors, employees, attorneys, agents, representatives, heirs, beneficiaries, successors and assigns." This language evidences the parties' intent to include Tradex Global Advisors, LLC, and all of its possible affiliates.

¶ 42    In paragraph F, the terms " 'Claim' or 'Claims' " are then given an expansive 249-word definition that includes "*all* claims" as well as "*any right* or claim *for the payment of money \*\*\** whether known or unknown, \*\*\* or based upon any contract or agreement \*\*\* and which are based upon, relate to, or arise out of any conduct, event, transaction, or occurrence *from the beginning of the world* through the effective date of this Release." (Emphasis added.) As the paragraph continues, the terms " 'Claim' or 'Claims' " are further defined to encompasses "any right or claim for the payment of money or equitable relief of any type *asserted in*, or which could have been asserted in any way by Tradex against Positron." (Emphasis added.) If there could be any doubt that the definition is very broad, the concluding sentence clearly states that Tradex

"intended" for the terms " 'Claim' or 'Claims' " "to be given the broadest possible interpretation to effectuate the intent of the Parties that this Release shall constitute a general, *global*, and *complete* release of Positron by Tradex *without any exceptions or reservations*." (Emphasis added.)

¶ 43    These statements in the Recitals section cover every and any conceivable "right or claim for the payment of money," regardless of why or when that entitlement arose, and hark back to the monetary claim that Tradex had already asserted in Illinois against Rooney and his companies.

¶ 44    The release continues, however, under the subheading "General Release." There, Tradex states "for value received" (which we read to mean the $125,000 that Rooney brought to the table), "and in further consideration of the provisions of the Plan, Tradex unconditionally releases all Claims against Positron." Although Positron is Positron and not Rooney, the language continues. Paragraph 1 specifies that the "above release by Tradex is intended to constitute a global and general release of *all* such Claims held or asserted, and/or potentially held or asserted, by Tradex against Positron and the *Positron Related Parties*." Paragraph 2 further broadens the scope, stating, "This Release by Tradex shall also inure to the benefit of *** each of the insiders *** (collective[ly], the Positron Related Parties), all of which are also express and intended beneficiaries of this Release." Rooney had been expressly described as an "insider" throughout Positron's bankruptcy. In Paragraph 3, "Tradex further agrees, promise and forever covenants not to file, prosecute, or continue prosecuting a lawsuit, *** legal proceeding, or other dispute resolution procedure against *** any of the Positron Related Parties concerning any Claim or claims released herein, whether known or unknown, *** which they may now have or may make in the future." At the time, Tradex knew that it had an unsatisfied "Claim" against Rooney in

Illinois.

¶ 45     By our count, this is a 790-word contract, excluding the signature lines. The parties devoted one-third of that contract to the definition of " 'Claim' or 'Claims,' " which prevents any misinterpretation. The definition of " 'Claim' or 'Claims' " that Tradex agreed to in 2017 was comprehensive enough to include "*all* claims" and "any *right or claim for the payment of money*" that Tradex had "*asserted in*" the lawsuit that it filed in 2012 in Illinois, resolved in 2015 by agreeing to a judgment, and was attempting to collect in 2017 in the Texas bankruptcy. Tradex had followed its money from Delaware to Illinois to Texas. In Texas, it entered into a release that was broad enough to encompass not only the Texas action and Positron but also the Illinois action and Rooney.

¶ 46     The observations in *Rakowski v. Lucente*, 104 Ill. 2d 317, 323 (1984), are applicable here:

> "The release stated that the terms of the settlement were 'completely read,' 'fully understood,' and 'voluntarily accepted" by Lucente as a 'full and final compromise adjustment *** of any and all claims *** and for the *express purpose of precluding forever any further or additional claims ***'* (Emphasis added.) The claims to be released are described in comprehensive language as 'any and all claims, demands, damages, actions, causes of action or suits of any kind or nature ***, and particularly on account of all injuries, known and unknown, *** which have resulted or may in the future develop from an accident which occurred.' There is no basis for Lucente's argument that the release did not include a specific type of action, that is, his right against Rakowski for contribution, because that action was not expressly enumerated. When employing a release as broad as

the one used here, any attempt to list the specific types of action included in the release might have detracted from its broad and general scope."

¶ 47    Similarly, while Tradex and Positron did not attempt to name any particular person or specific dispute, trying to name Rooney and the Illinois settlement "might have detracted from [the] broad and general scope" of the Unconditional General Release that Tradex and Positron crafted. *Id.*

¶ 48    However, citing dictionary definitions, Tradex now proposes that the term "claim" cannot be read to include the Illinois agreed "judgment," because claims and judgments are distinctly different stages of a dispute. Roughly speaking, a claim is a party's demand for money that it believes is due and a judgment is a court's subsequent, final determination of what amount of money, if any, is actually due. Tradex relies on *Central Illinois Public Service Co. v. American Empire Surplus Lines Insurance Co.*, 267 Ill. App. 3d 1043, 1047 (1994) (legal and lay dictionaries define claims as demands for money, property or something due or believed to be due) and *In re Skylstad*, 160 Wash. 2d 944, 957, 162 P.3d 413, 419 (2007) (Fairhurst, J., dissenting) (legal dictionary considers a judgment to be a court's final determination of the litigants' rights and obligations). Tradex argues that its release applies to the "claims" defined in the release, but not to any "judgments" because the parties did not include the latter term.

¶ 49    Tradex's reliance on dictionary definitions is misplaced, because the parties defined " 'Claim' or 'Claims' " and their specific definition prevails over a general definition found in a dictionary. In *James River Insurance Co. v. Judlau Contracting, Inc.*, 2019 IL App (1st) 181993-U, ¶¶ 23-24, the court addressed the interpretation of the term "employee" as used within a commercial general liability insurance policy. An exclusion to coverage included a specific

definition of " 'employee,' " stating the term " 'shall mean any member, associate, 'leased worker,' 'temporary worker' or any person or persons loaned to or volunteering services to you.' " *Id.* at ¶ 23. The court found this definition to be controlling, even though it was broader than the term's ordinary meaning and included six categories of individuals not commonly considered to be employees. *Id.* at ¶ 24. The court adhered to the agreed-upon definition, illustrating that when a term is defined within a contract, that definition takes precedence over external sources like dictionaries. In *Gaudina v. State Farm Mutual Automobile Insurance Co.*, 2014 IL App (1st) 1312641, a husband and wife were estranged and he was living elsewhere when he was involved in a car accident with an underinsured driver. He looked to his wife's automobile insurance policy for underinsured motorist benefits. *Id.* The policy defined " '*spouse,*' " as " '*your* husband or wife who resides primarily with *you.*' " *Id.* at 21. He argued that "a reasonable person would understand 'spouse' to mean a husband or wife, without the caveat that the spouse must reside primarily with the insured." *Id.* at 19. The court said, [b]ecause the term 'spouse' is specifically defined in the policy, the definition in the policy controls. [Citation.] We therefore have no reason to turn to a dictionary definition of 'spouse' " *Id.* at 22. The release was precise and not ambiguous. "Where the terms of the release are clear and explicit, the court must enforce them as written." *Rawkowski*, 104 Ill. 2d at 323.

¶ 50     Tradex argues that nothing less than full payment of the 2015 judgment amount plus interest would warrant the circuit court's ruling, and that $125,000 was far less than that figure.

¶ 51     Questions of statutory interpretation are addressed *de novo*. *Mosby v. Ingalls Memorial Hospital*, 2023 IL 129081, ¶ 28. The primary principle when construing a statute is to ascertain and give effect to the intent of the legislature. *Id.* at 30. The statutory language is considered the

best indication of the legislature's intent, and we are to read the words used with their plain and ordinary meaning. *Id.*

¶ 52    The statute states that the circuit court may vacate the judgment and dismiss the action upon "the filing of a release *or* satisfaction in full satisfaction of judgment." (Emphasis added.) 735 ILCS 5/12-183(h) (West 2016). In statutory interpretation, we are to give each word " 'a reasonable meaning and not render[] [any word] superfluous.' " *Mosby*, 2023 IL 129081, ¶ 36 (quoting *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001)).

> "The word 'or' is disjunctive. As used in its ordinary sense, the word 'or' marks an alternative indicating the various parts of the sentence which it connects are to be taken separately. In other words, 'or' means 'or.' Disjunctive therefore connotes two different alternatives."
>
> Accordingly, the phrase prior to the 'or' and the phrase following the 'or' connotes two different alternatives." *Mosby*, 2023 IL 129081, ¶ 36 (cleaned up).

¶ 53    The legislature used the word "or" to separate the word "release" from "satisfaction in full satisfaction." This wording means that either a "release *** of judgment" or a "satisfaction in full satisfaction of judgment" satisfies the statute. 735 ILCS 5/12-183(h) (West 2016). As discussed above, a release is the act of giving up an enforceable right or claim. Rooney filed Tradex's release, in satisfaction of the statutory criterion.

¶ 54    For all these reasons, we find that the decision to grant Rooney's motion to vacate the 2015 agreed judgment as to Rooney was not against the manifest weight of the evidence. We affirm the judgment of the circuit court.

¶ 55    Affirmed.